**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NBA PROPERTIES, INC., MLB ADVANCED MEDIA, L.P., MAJOR LEAGUE BASEBALL PROPERTIES, INC., NHL ENTERPRISES, L.P., NFL PROPERTIES LLC, COLLEGIATE LICENSING COMPANY, LLC, and BOARD OF TRUSTEES OF MICHIGAN STATE UNIVERSITY, | Case No. 21-cv-05520 |
| Plaintiffs, | |
| v. | |
| THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A," | |
| Defendants. | |

**COMPLAINT**

Plaintiffs NBA Properties, Inc. ("NBAP"), MLB Advanced Media, L.P. ("MLBAM"), Major League Baseball Properties, Inc. ("MLBP"), NHL Enterprises, L.P. ("NHLE"), NFL Properties LLC ("NFLP"), Collegiate Licensing Company, LLC, formerly IMG College Licensing, LLC ("CLC"), and Board of Trustees of Michigan State University ("MSU"), collectively "Plaintiffs," hereby bring the present action against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants") and allege as follows:

## I. JURISDICTION AND VENUE

1.      This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b), and 28 U.S.C. § 1331.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets business activities toward consumers in the United States, including Illinois, through at least the fully interactive, e-commerce stores[1] operating under the seller aliases identified in Schedule A attached hereto (collectively, the "Seller Aliases").  Specifically, Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, have sold and continue to sell products using infringing and counterfeit versions of Plaintiffs' federally registered trademarks to residents of Illinois.  Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiffs substantial injury in the State of Illinois.

## II. INTRODUCTION

3.      This action has been filed by Plaintiffs to combat e-commerce store operators who trade upon Plaintiffs' reputation and goodwill by offering for sale and/or selling unauthorized and unlicensed products using infringing and counterfeit versions of one or more of the trademarks owned and/or licensed by the Plaintiffs (the "Counterfeit Products").  Plaintiffs are members of the Coalition to Advance the Protection of Sports logos ("CAPS"), which is

---

[1] The e-commerce store urls are listed on Schedule A hereto under the Online Marketplaces and Domain Names.

administered by Trademark Management LLC ("TML"). In collaboration with CAPS, Plaintiffs have established a comprehensive program of trademark protection and enforcement. In particular, CAPS has created an extensive anti-counterfeiting program for Plaintiffs, which includes regularly investigating suspicious e-commerce stores and enforcing Plaintiffs' trademark rights to prevent the sale of Counterfeit Products.

4. Defendants create e-commerce stores operating under one or more Seller Aliases that are advertising, offering for sale and selling Counterfeit Products to unknowing consumers. E-commerce stores operating under the Seller Aliases share unique identifiers, establishing a logical relationship between them and demonstrating that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid and mitigate liability by operating under one or more Seller Aliases to conceal both their identities and the full scope and interworking of their counterfeiting operations. Plaintiffs are forced to file these actions to combat Defendants' counterfeiting of the trademarks owned or licensed by the Plaintiffs, as well as to protect unknowing consumers from purchasing Counterfeit Products over the Internet. Plaintiffs have been irreparably harmed and continue to be irreparably damaged through consumer confusion, dilution, and tarnishment of their valuable trademarks as a result of Defendants' actions and seek injunctive and monetary relief.

## III. THE PARTIES

**The Plaintiffs**

**NBA Properties, Inc.**

5.     Plaintiff NBAP is a corporation duly organized and existing under the laws of the State of New York with its principal place of business at 645 Fifth Avenue, New York, New York.

6.     The National Basketball Association ("NBA") is an unincorporated association and professional basketball league, comprised of thirty (30) member teams ("NBA Teams"), including the Chicago Bulls, that provide professional basketball entertainment services and that collectively own NBAP.   NBAP manages trademark affairs, including licensing and enforcement, for the NBA and NBA Teams.

7.     NBAP is the owner and/or the exclusive licensee of the famous and distinctive trademarks of the NBA and the NBA Teams, and is authorized to enforce the rights in those trademarks.   NBAP commercially exploits, protects and enforces rights in the famous and distinctive trademarks, names, logos, symbols, emblems, uniform designs, uniform trade dress colors, and other identifying indicia associated with the NBA and the NBA Teams (collectively, the "NBA Trademarks"), including, but not limited to, those that are the subject of valid and subsisting trademark registrations on the Principal Register of the United States Patent and Trademark Office and those that NBAP and the NBA Teams have adopted and used in commerce throughout the United States, including in Illinois.   NBAP owns more than one hundred fifty (150) United States Federal Trademark Registrations in a variety of classes and for a variety of different goods and services, including, without limitation, many for apparel, such as jerseys, shirts, caps, and other products in international class 25.   Among the NBA Trademarks

owned by NBAP and registered before the United States Patent and Trademark Office are the

word mark "NBA" (reg. no. 1,833,902) and the NBA Player Silhouette Logo:  (reg. no.

1,966,924). A partial list of the famous and distinctive NBA Trademarks owned by NBAP,

registered before the United States Patent and Trademark Office, and currently in use in

commerce includes the following:

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 1,833,902 | NBA | For: clothing, namely, hosiery, footwear, sweat shirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, belts, ties, nightshirts, hats, warm-up suits, jackets, parkas, coats, cloth bibs, head bands and wrist bands in class 025. |
| 2,183,983 | NATIONAL BASKETBALL ASSOCIATION | For: clothing, namely, hosiery, footwear, t-shirts, sweat shirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, hats, warm-up suits, jackets, parkas, coats, cloth bibs, head bands, wrist bands, aprons, boxer shorts, slacks, caps, ear muffs and gloves in class 025. |
| 1,525,782 |  | For: hosiery, footwear, t-shirts, sweat shirts, tank tops, pajamas, sport shirts, belts, nightshirts, stocking caps, warm-up or jogging suits, jackets, bibs, head bands and wrist bands in class 025.<br><br>For: entertainment services, namely, organizing and conducting basketball exhibitions in class 041. |
| 1,715,549 |  | For: jewelry; namely, wrist watches, pins, earrings, necklaces, rings, cuff links and belt buckles in class 014. |

| | | |
|---|---|---|
| 1,966,924 |  | For: clothing, namely hosiery, footwear, t-shirts, sweat shirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, hats, warm-up suits, jackets, parkas, coats, cloth bibs, head bands, wrist bands, aprons, boxer shorts, slacks, caps, ear muffs, and gloves in class 025. |
| 2,157,039 |  | For: clothing, namely, hosiery, footwear, sweat shirts, sweatpants, pants, tank tops, jersey, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, warm-up suits, parkas, coats, cloth bibs, head bands and wrist bands in class 025. |
| 2,079,493 |  | For: clothing, namely, hosiery, footwear, sweat shirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, warm-up suits, parkas, coats, cloth bibs, head bands and wrist bands in class 025. |
| 5,237,767 |  | For: Jewelry; costume jewelry; beaded jewelry; rubber or silicon wristbands in the nature of a bracelet, beaded necklaces; beads for use in the manufacture of jewelry; earrings, necklaces, rings, bracelets, cuff links, pendants, charms for collar jewelry and bracelets; clocks; watches; watch bands and watch straps, watch cases, watch fobs; jewelry boxes, tie clips; medallions; non-monetary coins of precious metal; precious metals; key chains of precious metal; key chains as jewelry; figures and figurines of precious metal; trophies of precious metals in class 014. |

The above U.S. registrations for the NBA Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. The registrations for the NBA Trademarks constitute *prima facie* evidence of their validity and of NBAP's exclusive right to use the NBA Trademarks pursuant to 15 U.S.C. § 1057(b). True and correct copies of the

Federal Trademark Registrations for the above NBA Trademarks are attached hereto as **Exhibit 1**.

8.  The NBA brand of professional basketball and NBA Trademarks are widely known to and enormously popular with both sports fans and the general public. NBAP has promoted and advertised the NBA, the NBA Teams and NBA Trademarks extensively for many years. NBA Trademarks are among the most renowned and immediately recognizable marks in professional sports today. As a result of substantial advertising, promotion and media attention, and NBAP's extensive licensing and sponsorship program for a wide variety of goods and services, NBA Trademarks have acquired secondary meaning and represent significant goodwill of great value to NBAP, the NBA and the NBA Teams.

9.  Hundreds of millions of fans have attended NBA games and related events, enjoyed television and radio broadcasts of NBA games and related events, and purchased merchandise bearing NBA Trademarks to identify with their favorite NBA Teams. Millions visit <NBA.com>, the official NBA website, as well as the official websites of the individual NBA Teams, which prominently display, and in many cases are accessed by domain names containing, NBA Trademarks.

10.  A significant aspect of NBAP's business and resulting revenues has been for many years, and continues to be, the merchandising and licensing of NBA Trademarks. NBAP has entered into numerous licensing agreements in the United States and around the world, authorizing use of NBA Trademarks on a wide variety of products, including apparel, caps, jewelry, toys, furniture, pennants, and bags, among others (collectively, "NBA Products"). Retail sales of NBA Products exceeded $2 billion in 2019.

7

11.     NBAP, directly and through authorized licensees, has established and maintains high standards of quality for NBA Products, and continues to maintain stringent quality control over licensees and other authorized users of NBA Trademarks.

12.     In supervising licensees, NBAP provides licensees and licensed product manufacturers with specifications setting forth extensive details with respect to use of NBA Trademarks, including typeface and typography, color renderings, official uniform scripts, graphic designs, materials, workmanship, and quality.  All NBA Products are reviewed under these strict quality control procedures.

13.     As a result of the extensive use of NBA Trademarks, not only in connection with the NBA's well-known basketball games and related events, but also in connection with a wide variety of licensed merchandise promoted, sold and/or rendered in the United States and abroad, as well as widespread use in connection with a broad array of sponsorship activities spanning diverse industries, such trademarks have for many decades, and long prior to any use made by Defendants, functioned as unique identifiers and synonyms in the public mind for NBAP, the NBA, and the NBA Teams.  As a result, NBA Trademarks are famous and possess significant goodwill of great value to NBAP, the NBA and the NBA Teams.

14.     To protect NBA Trademarks from infringement, dilution, disparagement, and misappropriation, NBAP, in collaboration with CAPS, has established a comprehensive program of trademark protection, including, among other things, regularly investigating suspicious e-commerce stores identified in proactive Internet sweeps and reported by consumers.

**MLB Advanced Media, L.P. and Major League Baseball Properties, Inc.**

15.     MLBAM is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 1271 Avenue of the Americas, New York, New

York 10020. Its general partner is MLB Advanced Media, Inc., a Delaware corporation with its principal place of business at 1271 Avenue of the Americas, New York, New York 10020.

16. Among other things, MLBAM manages and operates the official Major League Baseball site, <MLB.com>, and each of the official MLB Club sites (e.g., <cubs.com> and <whitesox.com>) to create the most comprehensive Major League Baseball resource on the Internet.

17. MLBP is a New York corporation with its principal place of business at 1271 Avenue of the Americas, New York, New York 10020.

18. Plaintiffs MLB Advanced Media, L.P. ("MLBAM") and Major League Baseball Properties, Inc. ("MLBP") (collectively the "MLB Parties") are the licensees of and/or act as agents for each of the thirty (30) Major League Baseball Clubs (the "MLB Clubs"), the Office of the Commissioner of Baseball (the "BOC"), and their respective affiliated and related entities (collectively, with the MLB Parties, the "MLB Entities") with respect to a variety of matters including the licensing and/or protection of intellectual property rights of the applicable MLB Entities (including those of the Chicago Cubs and Chicago White Sox) throughout the world.

19. Pursuant to agreements among the MLB Entities, the MLB Parties commercially exploits, protects and enforces rights in the famous and distinctive trademarks, names, logos, symbols, emblems, uniform designs, uniform trade dress colors, and other identifying indicia associated with the MLB Entities (collectively, the "MLB Trademarks"), including, but not limited to, those that are the subject of valid and subsisting trademark registrations on the Principal Register of the United States Patent and Trademark Office and those that MLB Entities have adopted and used in commerce throughout the United States, including in Illinois. The MLB Entities own more than one thousand five hundred (1,500) United States federal trademark

registrations in a variety of classes and for a variety of different goods and services, including, without limitation, many for apparel, such as jerseys, shirts, caps, and other products in international class 25. Among MLB Trademarks are the word mark "MAJOR LEAGUE BASEBALL" (reg. no. 1,620,020) and the MLB silhouette logo:  (reg. no. 1,617,698). A non-exhaustive list of the famous and distinctive MLB Trademarks owned by certain MLB Entities, registered before the United States Patent and Trademark Office, and currently in use in commerce, include the following:

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 1,620,020 | MAJOR LEAGUE BASEBALL | For: clothing, namely, shirts, shorts, dresses, socks, underwear, jackets, sweaters, pants, visors, caps, bibs, infantwear, namely, baby shorts sets, romper sets, baby pants, coveralls; outerwear, namely, uniforms and pullovers, ties, robes and loungewear, sweatshirts, knitted headwear, hosiery, wristbands, robes and shoes in class 025. |
| 2,779,958 | MLB | For: clothing, namely, caps, hats, visors, knitted headwear, headbands, shirts, t-shirts, tank tops, sweaters, turtlenecks, pullovers, vests, shorts, pants, dresses, baseball uniforms, jerseys, sweatshirts, sweatpants, underwear, boxer shorts, sleepwear, jackets, cloth bibs, infantwear, rompers, coveralls, creepers, baby booties, ties, wristbands, scarves, socks, hosiery in class 025. |
| 1,617,698 |  | For: clothing, namely, shirts, shorts, dresses, socks, underwear, jackets, sweaters, pants, visors, caps, bibs, infantwear, namely, baby shorts sets, romper sets, baby pants, coveralls; outerwear, namely, uniforms and pullovers, ties, robes and loungewear, sweatshirts, knitted headwear, hosiery, wristbands, robes, and shoes in class 025. |
| 2,569,970 |  | For: jewelry, namely, bracelets, charms, earrings, rings, necklaces, pendants, watches, costume jewelry, medallions, lapel pins, tie clips, tie fasteners, cuff links, belt buckles of precious metal, money clips of precious metal, clocks, non-monetary coins of precious metal in class 014. |

| | | |
|---|---|---|
| 2,573,503 |  | For: clothing, namely, caps, hats, visors, knitted headwear, shirts, t-shirts, tank tops, sweaters, turtlenecks, pullovers, vests, shorts, baseball uniforms, jerseys, warm-up suits, sweatshirts, sweatpants, underwear, boxer shorts, robes, sleepwear, jackets, cloth bibs, infantwear, infant diaper covers, cloth diaper sets with undershirt and diaper cover, rompers, coveralls, creepers, baby booties, ties, belts, wristbands, scarves, footwear, socks, slippers, aprons in class 025. |
| 3,410,585 | WORLD SERIES | For: Jewelry, namely, bracelets, earrings, pendants, watches, costume jewelry, rubber or silicone bracelets and wristbands in the nature of bracelets, medallions, ornamental metal pins, lapel pins, cuff links, money clips of precious metal, metal key chains of precious metal, metal key rings of precious metal, clocks, wall clocks, and non-monetary coins of precious metal in class 014. |
| 5,510,999 |  | For: Clothing, namely, headwear, shirts, sweatshirts, jackets, infant wear in class 025. |
| 5,511,001 |  | For: trophies of common metal in class 006. |

11

| 5,511,002 |  | For: trophies of precious metal; ornamental pins; lapel pins; rings; bracelets; charms for jewelry; non-monetary coins; clocks; key chains; key rings in class 014. |
|---|---|---|

The above U.S. registrations for the MLB Trademarks are valid, subsisting, in full force and effect, and all are incontestable pursuant to 15 U.S.C. § 1065. The registrations for the MLB Trademarks constitute *prima facie* evidence of their validity and of MLB's exclusive right to use the MLB Trademarks pursuant to 15 U.S.C. § 1057(b). True and correct copies of the Federal Trademark Registrations for the above MLB Trademarks are attached hereto as **<u>Exhibit 2</u>**.

20. MLB Trademarks are widely known to and enormously popular with both sports fans and the general public. MLB has promoted and advertised the MLB Clubs, games between the MLB Clubs, related events, and MLB Trademarks extensively for many years. MLB Trademarks are among the most renowned and immediately recognizable marks in professional sports today. As a result of substantial advertising, promotion and media attention, and MLB's extensive licensing and sponsorship program for a wide variety of goods and services, MLB Trademarks have acquired secondary meaning and represent significant goodwill of great value to the MLB Entities.

21. Hundreds of millions of customers have attended games between the MLB Clubs and related events, enjoyed television and radio broadcasts of games between the MLB Clubs and related events, and purchased merchandise bearing MLB Trademarks to identify with their

favorite MLB Clubs. Millions visit <MLB.com>, the official Major League Baseball website, as well as the official websites of the individual MLB Clubs, which prominently display, and in many cases are accessed by domain names containing, MLB Trademarks.

22.     A significant aspect of MLB's business and resulting revenues has been for many years, and continues to be, the merchandising and licensing of MLB Trademarks. The MLB Entities have entered into numerous licensing agreements in the United States and around the world, authorizing use of MLB Trademarks on a wide variety of products, including apparel, caps, jewelry, toys, furniture, pennants, and bags, among others (collectively, "MLB Products"). Retail sales of MLB Products exceeded $1 billion in 2016.

23.     The MLB Parties, directly and through authorized licensees, have established and maintained high standards of quality for MLB Products, and continues to maintain stringent quality control over licensees and other authorized users of MLB Trademarks.

24.     In supervising licensees, the MLB Parties provide licensees and licensed product manufacturers with specifications setting forth extensive details with respect to use of MLB Trademarks, including typeface and typography, color renderings, official uniform scripts, graphic designs, materials, workmanship, and quality. All MLB Products are reviewed under these strict quality control procedures.

25.     As a result of the extensive use of MLB Trademarks, not only in connection with well-known baseball games between the MLB Clubs and related events, but also in connection with a wide variety of licensed merchandise promoted, sold and/or rendered in the United States and abroad, as well as widespread use in connection with a broad array of sponsorship activities spanning diverse industries, such trademarks have for many decades, and long prior to any use made by Defendants, functioned as unique identifiers and synonyms in the public mind for the

MLB Entities, including the MLB Clubs.  As a result, MLB Trademarks are famous and possess significant goodwill of great value to the MLB Entities, including the MLB Clubs.

26.     To protect MLB Trademarks from infringement, dilution, disparagement, and misappropriation, the MLB Parties, in collaboration with CAPS, have established a comprehensive program of trademark protection, including regularly investigating suspicious e-commerce stores identified in proactive Internet sweeps or reported by consumers.  The MLB Parties manage these activities on behalf of the MLB Entities.

**NHL Enterprises L.P.**

27.     Plaintiff NHLE is a Delaware limited partnership having a principal place of business at 1185 Avenue of the Americas, New York, New York.

28.     The National Hockey League ("NHL") is an unincorporated association organized as a joint venture to operate a professional ice hockey league consisting of thirty-two (32) member clubs (the "NHL Teams"), including the 2015 Stanley Cup Champion Chicago Blackhawks.  The NHL has existed since 1917 and has consistently attracted a large public following, both in the United States and worldwide.

29.      NHLE is the exclusive national United States licensee of the famous and distinctive trademarks of the NHL (including names, logos, symbols, emblems, uniform designs, uniform trade dress colors, and other identifying indicia associated with the NHL) ("NHL League Trademarks"), and is authorized by the NHL to enforce the rights in the NHL League Trademarks.  In addition, NHLE is the exclusive national United States licensee of the famous and distinctive trademarks of the NHL Teams collectively (including names, logos, symbols, emblems, uniform designs, uniform trade dress colors, and other identifying indicia associated with the NHL Teams) ("NHL Team Trademarks," and, together with the "NHL League

Trademarks," the "NHL Trademarks"). NHLE is authorized by the NHL Teams to enforce the rights in the NHL Team Trademarks. The NHL Trademarks include, but are not limited to, those that are the subject of valid and subsisting trademark registrations on the Principal Register of the United States Patent and Trademark Office and those that the NHL and the NHL Teams have adopted and used in commerce throughout the United States, including in Illinois. In particular, NHLE is the exclusive United States licensee of and is authorized to enforce over one hundred (100) United States federal trademark registrations for NHL League Trademarks in a variety of classes and for a variety of different goods and services, including, without limitation, for apparel such as jerseys, shirts, caps, and other products in international class 25. Among the NHL League Trademarks are the word mark "NHL" (reg. no. 1,962,135) and the NHL Logo:

 (reg. no. 3,248,499). A non-exhaustive list of the NHL League Trademarks, registered with the United States Patent and Trademark Office and currently in use in commerce, includes the following:

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 1,962,135 | NHL | For: clothing, namely, shirts, jerseys, sweaters, jackets, sweatshirts, t-shirts, pants, sweatpants, warm-up suits, wristbands, headbands, shorts, caps, hats, socks, nightshirts, scarves, mittens and cloth bibs in class 025. |
| 2,422,903 | STANLEY CUP | For: clothing, namely, caps, cloth bibs, hats, jackets, jerseys, shirts, shorts, sweaters, sweatpants, sweatshirts, t-shirts, ties, vests and warm-up suits in class 025. |
| 4,631,182 | NHL | For: items made of precious and non-precious metals, namely, commemorative coins, and medals; trophies and key chains made of precious metals; jewelry, charms, earrings, medallions, rings, necklaces, tie tacks, pins in the nature of jewelry; chronometric instruments in the nature of docks and clocks in class 014. |

| | | |
|---|---|---|
| 4,767,415 | STANLEY CUP | For: precious metal trophies in class 014. |
| 1,678,612 |  | For: clothing and footwear; namely, jerseys, sweaters, jackets, sweatshirts, t-shirts, sweatpants, shirts, caps, hats in class 025. |
| 3,248,499 |  | For: clothing, namely, bandannas, beach cover-ups, belts, body suits, boxer shorts, caps, cloth bibs, coats, dresses, footwear, ear muffs, gloves, hats, headbands, hosiery, housecoats, jackets, jerseys, leggings, leotards, mittens, nightshirts, pajamas, pants, rain coats, rain wear, robes, scarves, shirts, shorts, skirts, socks, suits, sun visors, suspenders, sweaters, sweatpants, sweatshirts, swimsuits, swim trunks, t-shirts, ties, toques, underwear, vests, warm-up suits and wristbands in class 025. |
| 5,165,350 |  | For: items made of precious and non-precious metals, namely, commemorative coins, and medals; trophies and key chains made of precious metals; jewelry, charms, earrings, medallions, rings, necklaces, tie tacks, pins in the nature of jewelry; chronometric instruments in the nature of docks and clocks in class 014. |
| 2,395,418 |  | For: clothing, namely, caps, cloth bibs, hats, jackets, jerseys, shirts, shorts, sweaters, sweatpants, sweatshirts, t-shirts, ties, vests and warm-up suits in class 025. |
| 4,677,429 |  | For: Items made of precious and non-precious metals, namely, commemorative coins, and medals; key chains made of precious metals; jewelry, charms, earrings, medallions, rings, necklaces, tie tacks, pins in the nature of jewelry; chronometric instruments in the nature of docks and clocks in class 014. |

The above U.S. registrations for the NHL League Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. The registrations for the NHL League Trademarks constitute *prima facie* evidence of their validity and of NHLE's

16

exclusive right to use the NHL Trademarks pursuant to 15 U.S.C. § 1057(b). True and correct copies of the Federal Trademark Registrations for the above NHL League Trademarks are attached hereto as **Exhibit 3**.

30.     The NHL brand of professional hockey and NHL Trademarks are widely known to and enormously popular with both sports fans and the general public. NHLE has promoted and advertised the NHL, the NHL Teams and NHL Trademarks extensively for many years. NHL Trademarks are among the most renowned and immediately recognizable marks in professional sports today. As a result of substantial advertising, promotion and media attention, and NHLE's extensive licensing and sponsorship program for a wide variety of goods and services, NHL Trademarks have acquired secondary meaning and represent significant goodwill of great value to the NHL, NHLE and the NHL Teams.

31.     Millions of fans have attended NHL games and related events, enjoyed television and radio broadcasts of NHL games and related events, and purchased merchandise bearing NHL Trademarks to identify with their favorite NHL Teams. Millions visit <NHL.com>, the official NHL website, as well as the official websites of the individual NHL Teams, which prominently display, and in many cases are accessed by domain names containing, NHL Trademarks.

32.     A significant aspect of NHLE's business and resulting revenues has been for many years, and continues to be, the merchandising and licensing of the NHL Trademarks. NHLE has entered into numerous licensing agreements in the United States, authorizing use of NHL Trademarks on a wide variety of products, including apparel, caps, jewelry, toys, furniture, pennants, and bags, among others (collectively, "NHL Products"). Retail sales revenue in 2019 of NHL Products was in the hundreds of millions of dollars.

33.     NHLE, directly and through authorized licensees, has established and maintained high standards of quality for NHL Products, and continues to maintain stringent quality control over licensees and other authorized users of NHL Trademarks.

34.     In supervising licensees, NHLE provides licensees and licensed product manufacturers with specifications setting forth extensive details with respect to use of NHL Trademarks, including typeface and typography, color renderings, official uniform scripts, graphic designs, materials, workmanship, and quality.  All NHL Products are reviewed under these strict quality control procedures.

35.     As a result of the extensive use of NHL Trademarks, not only in connection with the NHL's well-known hockey games and related events, but also in connection with a wide variety of licensed merchandise sold and/or rendered in the United States and abroad, as well as widespread use in connection with a broad array of sponsorship activities spanning diverse industries, such trademarks have for many decades, and long prior to any use made by Defendants, functioned as unique identifiers and synonyms in the public mind for NHLE, the NHL, and the NHL Teams.  As a result, NHL Trademarks are famous and possess significant goodwill of great value to the NHL, the NHL Teams and NHLE.

36.     To protect NHL Trademarks from infringement, dilution, disparagement, and misappropriation, NHLE, in collaboration with CAPS, has established a comprehensive program of trademark protection, including regularly investigating suspicious e-commerce stores identified in proactive Internet sweeps and reported by consumers.

**NFL Properties LLC**

37.     NFLP is a Delaware limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 345 Park Avenue, New

York, New York. NFLP is the authorized representative of the National Football League ("NFL") and its thirty-two (32) member clubs, including the Chicago Bears (the "Member Clubs"), for the licensing and protection of their names, logos, symbols, and other identifying marks and indicia. The NFL is an unincorporated association of the Member Clubs, each of which owns and operates a professional football team engaged in providing entertainment services to the public in the form of competitive professional football games.

38.     The NFL and its Member Clubs have adopted and used in commerce certain trademarks, logos, symbols, and other identifying indicia relating to the activities of the NFL and the Member Clubs. The NFL and its Member Clubs have also adopted and used in commerce throughout the United States, including Illinois, certain trademarks relating to the activities of the NFL and its Member Clubs (referred to herein collectively as the "NFL Trademarks"). The NFL has registered a number of its marks with the United States Patent and Trademark Office,

including NATIONAL FOOTBALL LEAGUE, NFL, and the NFL Shield logo:                    . A non-exhaustive list of the famous and distinctive NFL Trademarks owned by NFLP, registered before the United States Patent and Trademark Office, and currently in use in commerce includes the following:

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 1,076,139 | NATIONAL FOOTBALL LEAGUE | For: promoting the interests of member football clubs, scheduling games, and promoting interest in football in class 041. |
| 2,919,270 | NFL | For: toys and sporting goods, namely, plush toys, stuffed animals, play figures, golf balls, golf bags, golf clubs, golf club covers, bowling balls, bowling bags, footballs, toy banks, hand held unit for playing electronic games; hand held unit for playing video |

| | | |
|---|---|---|
| | | games; board games relating to football, checker sets, chess sets, dominoes, Christmas tree ornaments, balloons, jigsaw puzzles, windsocks, kites, toy trucks, football shoulder pads, elbow, hand and knee pads, all for athletic use; billiard game playing equipment, exercise equipment, namely, chest protectors for sports, dart boards and dart board cases, volleyball equipment, namely, volleyballs fishing equipment, namely, fishing lures and fishing rods, handle grips for sporting equipment, athletic equipment, namely, personal floor mats, mouth guards, athletic sports wraps and athletic tape, snow sleds for recreation use, swim boards for recreation use, toy vehicles, toy model train sets, yo-yos in class 028. |
| 3,394,343 | NFL | For: Football helmets, cell phone covers, magnetic coded charge cards, decorative magnets, prerecorded DVDs featuring the sport of football, computer game software and disks, computer mouse pads, sunglasses in class 009. <br><br> For: Jewelry, pins, bracelets, charms, rings, collectible coins, commemorative coins, coins of precious metal, pendants and key chains made of precious metal in class 014. <br><br> For: Posters, calendars, trading cards, series of books relating to football, notepads, stickers, printed tickets to sports games and events; note paper, pictorial prints, picture postcards, art pictures, paper gift bags, paper decorations; collectible cards; collectible card and memorabilia holders; souvenir programs for sports events in class 016. <br><br> For: Men's, women's and children's clothing, namely, fleece tops and bottoms, headwear, caps, knit hats, t-shirts, shirts, turtlenecks, sweatshirts, shorts, tank tops, pants, jackets, golf shirts, knit shirts, jerseys, gloves, ties, cloth bibs; night shirts and pajamas; underwear, socks; towels in class 025. <br><br> For: Television broadcasting services; television transmission services; cable television broadcasting; radio broadcasting; broadcasting programming on the Internet; information transmission via electronic |

| | | |
|---|---|---|
| | | communications networks; transmission of information through video communication systems; communication services, namely, audio and video broadcasting; broadcasting services and provision of telecommunication access to video and audio content provided via a video on demand; streaming of audio material on the Internet; streaming of video material and podcasts on the Internet; electronic delivery of images and photos via a global computer network; providing multiple-user access to a global computer information network for the purpose of participating in interactive polling in the field of football; wireless communications services, namely, transmission of text, graphics, data, and entertainment information to mobile phones; mobile media and entertainment services in the nature of electronic transmission of entertainment media content in class 038.<br><br>For: Education and entertainment services in the nature of professional football games and exhibitions; providing sports and entertainment information via a global computer network or a commercial on-line computer service or by cable, satellite, television and radio; arranging and conducting athletic competitions, namely, professional football games and exhibitions; football fan club services; entertainment services, namely, musical and dance performances provided during intervals at sports events; educational services, namely, physical education programs; production of radio and television programs; live shows featuring football games, exhibitions, competitions, and musical and dance performances; sporting and cultural activities; distribution of television programming to cable and satellite television systems; distribution of television programs for others in class 041. |
| 3,581,281 |  | For: Football helmets, cell phone covers, magnetic coded charge cards, decorative magnets, prerecorded compact discs, and DVDs featuring the sport of football, computer game software and disks, computer mouse pads, sunglasses, eyeglass cases, and CD storage cases in class 009. |

|  |  | For: Jewelry, clocks, pins, bracelets, necklaces, charms, rings, collectible coins, commemorative coins, non-monetary coins of precious metal, pendants and key chains made of precious metal in class 014.<br><br>For: Posters, calendars, trading cards, a series of books in the field of football, magazines in the field of football, notepads, stickers, bumper stickers, and greeting cards; printed tickets to sports games and events; note paper, pictorial prints, picture postcards, art pictures, stationery, stationery-type portfolios, wrapping paper, paper table cloths, paper napkins, paper gift bags, paper party decorations; printed collectible cards; collectible card and memorabilia holders; souvenir programs for sports events in class 016.<br><br>For: Towels in class 024.<br><br>For: Clothing, namely, fleece tops and bottoms, headwear, caps, knit hats, t-shirts, shirts, turtlenecks, sweatshirts, shorts, tank tops, sweaters, pants, jackets, golf shirts, knit shirts, jerseys, wristbands, warm up suits, gloves, ties, cloth bibs; sleepwear, namely, bathrobes, and pajamas; underwear, socks; footwear; sneakers in class 025.<br><br>For: Toys and sporting goods, namely, plush toys, stuffed animals, play figures, golf balls, golf bags, golf club covers, footballs, toy banks, board games relating to football, playing cards, Christmas tree ornaments, balloons, jigsaw puzzles, toy, toy cars and trucks, billiard balls, dart boards, playing cards, miniature helmets in class 028.<br><br>For: Association services, namely, promoting the interests of professional football clubs; promoting the interests of member football clubs; scheduling games for member teams; promoting public interest in football; association services, namely, providing a forum for member football clubs to showcase, display, demonstrate and promote ideas, products, and services in connection with football; promotion of sporting and cultural activities in class 035. |
|---|---|---|

| | | |
|---|---|---|
| | | For Education and entertainment services in the nature of professional football games and exhibitions; providing sports and entertainment information via a global computer network or a commercial on-line computer service, or by cable, satellite, television or radio; arranging and conducting athletic competitions, namely, professional football games and exhibitions; football fan club services, namely, personal appearances by a costumed mascot for professional football teams; entertainment services, namely, live musical and dance performances provided during intervals at sports events; educational services, namely, conducting physical education programs; production of radio and television programs; presentation of live shows featuring football games, exhibitions, competitions, and musical and dance performances; organization of sporting and cultural activities; entertainment services, namely, an on-going series featuring football provided through cable television, satellite television, and television and radio broadcasts in class 041. |
| 3,286,411 |  | For: Luggage, shoulder bags, beach bags, duffle bags, all purpose sports bags, sports equipment bags, school bags, tote bags, knapsacks, rucksacks, wallets, umbrellas, waist packs, leather key fobs, luggage tags in class 018.<br><br>For: Textile goods, namely, cloth flags, curtains, quilts, towels, sheets, pillowcases, comforters, blankets, pillow shams, textile fabric for the manufacture of clothing, oven mitts, shower curtains, pot holders, textile wall hangings, fabric throws in class 024.<br><br>For: Marketing services, namely, promoting the goods and services of others by arranging for sponsors to affiliate their goods and services with various football personalities and/or the sport of football; dissemination of advertising for others via an on-line electronic communications network; promoting the sale of credit card accounts through the administration of incentive award programs; direct mail advertising for others in class 035. |

| | | |
|---|---|---|
| 3,661,464 |  | For: Handbags, luggage, shoulder bags, beach bags, duffle bags, clutch bags, all purpose sport bags, bags for sports, school bags, tote bags, knapsacks, wallets, travel bags, backpacks, umbrellas and luggage tags in class 018. |
| 2,954,420 | SUPER BOWL | For: men's, women's and children's clothing, namely, fleece tops and bottoms, caps, headwear, T-shirts, sweatshirts, shorts, tank tops, sweaters, pants, jackets, turtlenecks, golf shirts, knit shirts, jerseys, wind resistant jackets, cloth bibs, sleepwear, namely, night shirts and pajamas, knit hats and caps, and scarves in class 025. |
| 3,138,590 | SUPER BOWL | For: Football helmets, cell phone covers, decorative magnets, prerecorded DVDs all featuring the sport of football, computer mouse pads in class 009.<br><br>For: Jewelry, watches, clocks, pins, earrings, necklaces, bracelets, belt buckles made primarily of precious metals, charms, money clips made primarily of precious metals, rings, collectible coins, commemorative coins in class 014.<br><br>For: Posters, trading cards, series of books relating to football, magazines relating to football, notepads, stickers, bumper stickers, printed tickets to sports games and events; pens note paper, pictorial prints, art pictures, paper table cloths, paper party invitations, paper decorations, collectible cards; collectible card and memorabilia holders, souvenir programs for sports events in class 016.<br><br>For: Toys and sporting goods, namely, plush toys, stuffed animals, play figures, golf balls, footballs, Christmas tree ornaments, balloons, jigsaw puzzles, miniature helmets in class 028. |
| 2,941,347 |  | For: men's, women's and children's clothing, namely, fleece tops, caps, headwear, T-shirts, sweatshirts, jackets, jerseys, wind resistant jackets, knit hats and caps in class 025. |

| 3,138,589 |  | For: Football helmets, decorative magnets, and DVDs featuring the sport of football, computer game software in class 009.<br><br>For: Jewelry, pins, collectible coins, commemorative coins in class 014.<br><br>For: trading cards, series of books relating to football, collectible cards; collectible card and memorabilia holders, souvenir programs for sports events in class 016.<br><br>For: footballs, Christmas tree ornaments in class 028. |
|---|---|---|

The above U.S. registrations for the NFL Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. True and correct copies of the Federal Trademark Registrations for the above NFL Trademarks are attached hereto as **Exhibit 4**.

39. NFL Trademarks are among the most renowned and immediately recognizable marks in professional sports today. NFL professional football and NFL Trademarks are widely known to and enormously popular with both sports fans and the general public. NFLP has promoted and advertised the NFL, the Member Clubs and NFL Trademarks extensively for many years. As a result of substantial advertising, promotion and media attention, and NFLP's extensive licensing and sponsorship program for a wide variety of goods and services, NFL Trademarks have acquired fame and secondary meaning, and represent significant goodwill of great value to NFLP, the NFL and the Member Clubs.

40. Hundreds of millions of fans have attended NFL games and related events, enjoyed television and radio broadcasts of NFL games and related events, and purchased merchandise bearing NFL Trademarks to identify with their favorite Member Clubs. Millions

25

visit <nflshop.com>, the official NFL Internet web store, as well as the official websites of the individual Member Clubs, which prominently display, and in many cases are accessed by domain names containing, NFL Trademarks.

41.     A significant aspect of NFLP's business and resulting revenues has been for many years, and continues to be, the merchandising and licensing of NFL Trademarks.  NFLP has entered into numerous licensing agreements in the United States and around the world, authorizing use of NFL Trademarks on a variety of products, including apparel, caps, jewelry, toys, furniture, pennants, and bags, among others (collectively, "NFL Products").  NFLP generates significant and substantial revenue each year from its sales and licensing of the sale of the NFL Products.

42.     NFLP, directly and through authorized licensees, has established and maintained high standards of quality for NFL Products, and continues to maintain stringent quality control over licensees and other authorized users of NFL Trademarks.

43.     In supervising licensees, NFLP provides licensees and licensed product manufacturers with specifications setting forth extensive details with respect to use of NFL Trademarks, including typeface and typography, color renderings, official uniform scripts, graphic designs, materials, workmanship, and quality.  All NFL Products are reviewed under these strict quality control procedures.

44.     As a result of the extensive use of NFL Trademarks, not only in connection with the NFL's well-known football games and related events, but also in connection with a wide variety of licensed merchandise promoted, sold and/or rendered in the United States and abroad, as well as widespread use in connection with a broad array of sponsorship activities spanning diverse industries, the NFL Trademarks have for many decades, and long prior to any use made

26

by Defendants, functioned as unique identifiers and synonyms in the public mind for NFLP, the NFL, and the Member Clubs. As a result, NFL Trademarks are famous and possess significant goodwill of great value to NFLP, the NFL, and the Member Clubs.

45.     To protect NFL Trademarks from infringement, dilution, disparagement, and misappropriation, NFLP has established a comprehensive program of trademark protection, including regularly investigating suspicious e-commerce stores identified in proactive Internet sweeps and reported by consumers, both in collaboration with CAPS and as part of its independent trademark protection efforts.

**Collegiate Licensing Company, LLC**

46.     Plaintiff CLC is a Georgia limited liability company having its principal place of business at 1075 Peachtree Street, Suite 3300, Atlanta, Georgia 30309.

47.     Plaintiff CLC is a trademark licensing and enforcement agent that represents more than 600 colleges, universities, bowl games, and collegiate athletic conferences, including Michigan State University ("MSU").

48.     In addition to MSU, CLC is the trademark licensing agent for numerous other collegiate institutions including, without limitation, the University of Alabama, the University of Oklahoma, the University of Florida, the University of South Carolina, Auburn University, Louisiana State University, the University of Nebraska, West Virginia University, and Duke University (collectively, "Additional CLC University Clients") whose trademarks (the "Additional CLC Protected Trademarks") are used on Counterfeit Products without authorization and sold by one or more Defendants. Although not named as Plaintiffs herein, the Additional CLC University Clients have been and continue to be damaged by the unauthorized trademark use of the Defendants, and CLC suffers harm and damages as a result of these actions.

27

49.     A significant aspect of CLC's business has been for many years, and continues to be, the licensing of famous collegiate trademarks including, but not limited to, the MSU Trademarks, as defined herein, which are owned by Plaintiff MSU, as well as the Additional CLC Protected Trademarks (collectively, the "Collegiate Trademarks").  Indeed, the efforts of CLC together with the enormous popularity of the Collegiate Trademarks create valuable licensing royalties that support a myriad of programs and operations of MSU and the Additional CLC University Clients.  CLC, on behalf of MSU and the Additional CLC University Clients, has entered into numerous trademark licensing agreements in the United States and around the world, authorizing use of famous Collegiate Trademarks on a wide variety of products, including jerseys, caps, other apparel, and many other products.  As CLC generates revenues based upon the sale of licensed products, CLC is damaged by the sale of Counterfeit Products, which decreases sales of licensed genuine products and thus causes CLC significant financial and irreparable harm.

50.     CLC also uses its trademarks (collectively, the "CLC Trademarks") in connection with the licensed products using Collegiate Trademarks.  The United States Patent and Trademark Office has granted CLC numerous federal registrations for the CLC Trademarks, including, but not limited to, the following registrations:

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 1,891,318 | THE COLLEGIATE LICENSING COMPANY | For:  business consultation in the field of trademark licensing management, market development in the field of trademark licensing programs and administration of trademark licensing for others in class 035. |
| 1,891,319 | CLC | For:  business consultation in the field of trademark licensing management, market development in the field of |

| | | |
|---|---|---|
| | | trademark licensing programs and administration of trademark licensing for others in class 035. |
| 3,163,116 | COLLEGE VAULT | For:  clothing, namely, sweatshirts, sweatpants, shirts, T-shirts, sweaters, hats, caps, jackets, coats, uniforms, jerseys, undergarments, scarves, ties, visors, shorts, rainwear, and gloves in class 025. |
| 1,578,038 |  | For:  licensing services in the field of collegiate products and promotions for colleges, universities and post-season bowls in class 035. |
| 2,071,504 |  | For:  licensing services in the field of collegiate products and promotions for colleges, universities and post-season bowls in class 035. |
| 3,221,094 |  | For:  video game discs, and video game software, decorative magnets, computer mouse pads, neon signs, sunglasses in class 009.<br><br>For:  jewelry including watches, clocks, charms, pendants, earrings, cuff links, powder compacts of precious metal, lapel pins, tie tacks and bars, medals, and commemorative coins in class 014.<br><br>For:  paper and paper products, namely, spiral notebooks, pens, pencils, greeting cards, postcards, prints, letter openers, decals, bumper stickers, calendars, paper napkins, note pads, checkbook covers, bank checks, bookmarks, loose leaf binders, stationery-type portfolios, |

|  |  | desk sets, book covers, bookends, trading cards, pen and pencil cases, paper weights, posters, and stickers in class 016.

For: luggage, namely, athletic bags, attache cases, backpacks, barrel bags, book bags, duffel bags, tote bags, garment bags for travel, wallets, billfolds, purses, briefcase-type portfolios, key cases, business and credit card cases, change purses, umbrellas, patio umbrellas, animal leashes and collars for pets in class 018.

For: furniture and plastics, namely, mirrors, picture frames, pillows, plaques, and wind chimes in class 020.

For: house wares and household goods, namely, non-metal piggy banks, wicker baskets, beer mugs, portable beverage coolers, drinking glasses, bottle openers, lunch boxes, soap dishes, ice buckets, coasters not of paper and not being table linen, coffee cups, plates, commemorative plates, paper plates, cookie jars, bowls, shot glasses, fitted picnic baskets, stained glass decorations, statues made of china, crystal, glass, or porcelain, and plastic cups in class 021.

For: textiles, namely, textile fabrics for home and commercial interiors, curtains, cloth pennants, cloth flags, bed blankets, throw blankets, bed sheets, pillow cases, bed spreads, pot holders, kitchen towels, oven mitts, bath towels, and washcloths in class 024.

For: apparel, namely, t-shirts, polo shirts, rugby tops, jerseys, turtlenecks, infant one piece outfits, pajamas, boxer shorts, nightshirts, tank tops, shorts, pants, jeans, socks, ties, scarves, shoes, |
|---|---|---|

| | | slippers, sandals, nightgowns, sweatpants, sweatshirts, wristbands, head bands, hats, caps, visors, aprons, blazers, vests, jackets, raincoats, ponchos, leather coats, wind resistant jackets, warm up suits, athletic uniforms, bandanas, suspenders, cloth bibs, booties, bathing trunks, bikinis, gloves, mittens, bathing suits, bathing caps, and belts in class 025.<br><br>For: games and playthings, namely, stuffed toy animals, stuffed toys, balloons, board games, flying discs, dolls, toy vehicles, plush toys, toy banks, playing cards, bean bags, basketballs, footballs, miniature basketball hoop and backboard, golf balls, golf clubs, golf putters, golf club covers, golf tees, golf gloves, basketball backboard, yo-yos, ornaments for the Christmas tree, snow globes in class 028. |
|---|---|---|

The above U.S. registrations for the CLC Trademarks are valid, subsisting, in full force and effect, and all are incontestable pursuant to 15 U.S.C. § 1065. CLC recently underwent a name change and is in the process of updating the ownership information from IMG College Licensing, LLC to Collegiate Licensing Company, LLC. The registrations for the CLC Trademarks constitute *prima facie* evidence of their validity and of CLC's exclusive right to use the CLC Trademarks pursuant to 15 U.S.C. § 1057(b). True and correct copies of the Federal Trademark Registrations for the above CLC Trademarks are attached hereto as **Exhibit 5**.

51. As a result of the extensive use of CLC Trademarks in connection with a wide variety of licensed merchandise promoted, sold and/or rendered in the United States and abroad, as well as widespread use in connection with a broad array of sponsorship activities spanning diverse industries, such trademarks have for many decades, and long prior to any use made by

Defendants, functioned as unique identifiers and synonyms in the public mind for CLC. As a result, CLC Trademarks are famous and possess significant goodwill of great value to CLC.

52. To protect CLC Trademarks from infringement, dilution, disparagement, and misappropriation, CLC, in collaboration with CAPS, has established a comprehensive program of trademark protection, including regularly investigating suspicious e-commerce stores identified in proactive Internet sweeps and reported by consumers.

**Board of Trustees of Michigan State University**

53. MSU is a corporation organized and existing under the constitution and laws of the State of Michigan. MSU manages all aspects of the University's operations, including management of trademark affairs.

54. MSU, a flagship educational institution of the state of Michigan, was founded in 1855 and is located in East Lansing, Michigan. MSU offers a wide range of undergraduate, graduate and professional programs for its more than 49,000 students.

55. MSU is home to one of the most storied intercollegiate athletics programs in the nation. Through the 2019-20 athletic year, MSU has won a total of 27 NCAA national championships.

56. MSU is the owner of many of the famous and distinctive trademarks of MSU and is responsible for protecting those trademarks. MSU commercially exploits, protects and enforces rights in the famous and distinctive trademarks, names, logos, symbols, emblems, uniform designs, uniform trade dress colors, and other identifying indicia associated with MSU (collectively, the "MSU Trademarks"), including, but not limited to, those that are the subject of valid and subsisting trademark registrations on the Principal Register of the United States Patent and Trademark Office and those that MSU has adopted and used in commerce throughout the United States, including in Illinois. MSU owns more than fourteen United States federal

trademark registrations for MSU-specific marks in a variety of classes and for a variety of different goods and services, including, without limitation, many for apparel such as jerseys, shirts, caps, and other products in international class 25. Among the MSU Trademarks are the word mark "MICHIGAN STATE" (reg. no. 1,325,430) and the MSU Logo:



(reg. no. 1,326,001). A non-exclusive list of the famous and distinctive MSU Trademarks owned and/or licensed by MSU, registered before the United States Patent and Trademark Office, and currently in use in commerce include the following:

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 1,325,430 | MICHIGAN STATE | For: Metal License Plates and Frames for Motor Vehicles in class 006.<br><br>For: T-Shirts, Jerseys, Shorts, Jackets, Jogging Suits, Scarves, Gloves, Hats, Shoes, Baseball Hats, Sweaters, Hooded Jackets, Sweatshirts, Sweatbands, Children's Wear-Namely, Baby Bibs, Hosiery and Socks in class 025.<br><br>For: Stuffed Toys and Toy Animals, Footballs, Basketball Goal and Backboard, Sport Balls in class 028. |
| 1,326,001 |  | For: T-Shirts, Jerseys, Shorts, Jackets, Jogging Suits, Scarves, Gloves, Hats, Shoes, Baseball Hats, Sweaters, Hooded Jackets, Sweatshirts, Sweatbands, Children's Wear-Namely, Baby Bibs, Hosiery and Socks in class 025. |

| | | |
|---|---|---|
| 1,344,639 | MICHIGAN STATE UNIVERSITY | For: T-Shirts, Jerseys, Shorts, Jackets, Jogging Suits, Scarves, Gloves, Hats, Shoes, Baseball Hats, Sweaters, Hooded Jackets, Sweatshirts, Sweatbands, Children's Wear- Namely, Baby Bibs, and Knitted Booties, Hosiery and Socks in class 025. |
| 1,345,570 |  | For: Metal key chains and rings and metal license plates in class 006.<br><br>For: Posters, paper napkins, paper tablecloths, bumper stickers, pens, calendars, notebooks, writing paper in class 016.<br><br>For: T-shirts, jerseys, shorts, jackets, jogging suits, scarves, gloves, hats, shoes, baseball hats, sweaters, hooded jackets, sweatshirts, sweatbands, baby bibs, knitted booties, and hosiery in class 025.<br><br>For: Toy footballs, toy basketballs, stuffed animals, balls and equipment sold as a unit for playing a table basketball game in class 028.<br>For: Entertainment services, namely, conduction collegiate athletic exhibitions and games in class 041. |
| 1,348,875 |  | For: Ceramic plates, mugs, glass beverage ware om class 021.<br><br>For: Educational services, namely, conducting programs and classes at the undergraduate and graduate level in class 041. |

| | | |
|---|---|---|
| 1,373,876 |  | For: Pennants and flags in class 024.<br><br>For: T-shirts, jerseys, shorts, jackets, scarves, gloves, hats, baseball hats, sweaters, sweatshirts, children's wear, namely baby bibs, and socks in class 025. |
| 1,470,709 | MICHIGAN STATE SPARTANS | For: T-shirts, jerseys, shorts, jackets, scarves, gloves, hats, baseball hats, sweaters, sweatshirts, children's wear, namely baby bibs, and socks in class 025. |
| 3,499,195 |  | For: Clothing, namely; shirts, t-shirts, jerseys, tank tops, sweatshirts, pants, sweatpants, shorts, jackets, vests, skirts, dresses, jumpers, rompers, bibs, pajamas, scrubs, socks, underwear, athletic uniforms, ponchos, wristbands, belts, neckwear, bandanas, scarves, gloves, mittens; headwear; footwear in class 025.<br><br>For: Educational services, namely, providing courses of instruction and continuing education at the college and graduate level and conducting summer camps and workshops for youth in the fields of athletics, music, and fine arts and crafts; entertainment services in the nature of collegiate sporting events and competitions and conducting music concerts and arts festivals in class 041. |
| 3,508,753 |  | For: Clothing, namely, shirts, t-shirts, jerseys, tank tops, sweatshirts, pants, sweatpants, shorts, jackets, vests, skirts, dresses, jumpers, rompers, bibs, pajamas, scrubs, socks, underwear, athletic uniforms, belts, neckwear, bandanas, scarves, gloves, mittens; headwear; footwear in class 025.<br><br>For: Educational services, namely, providing courses of instruction and continuing education at the college and graduate level and conducting summer camps and workshops for youth in the fields of athletics, music, and fine arts and crafts; entertainment |

35

| | | |
|---|---|---|
| | | services in the nature of collegiate sporting events and competitions and conducting music concerts and arts festivals in class 041. |
| 3,510,691 |  | For: Clothing, namely, shirts, t-shirts, jerseys, tank tops, sweatshirts, pants, sweatpants, shorts, jackets, vests, skirts, dresses, jumpers, rompers, bibs, pajamas, scrubs, socks, underwear, athletic uniforms, belts, neckwear, bandanas, scarves, gloves, mittens; headwear; footwear in class 025.<br><br>For: Educational services, namely, providing courses of instruction and continuing education at the college and graduate level and conducting summer camps and workshops for youth in the fields of athletics, music, and fine arts and crafts; entertainment services in the nature of collegiate sporting events and competitions and conducting music concerts and arts festivals in class 041. |
| 4,662,048 | SPARTY | For: Children's books; bumper stickers; calendars; decals in class 016.<br><br>For: Clothing for adults and youths, namely, t-shirts, shirts, sweatshirts, and headwear, baby clothing, namely, t-shirts, shirts, sweatshirts, headwear and infant one-piece clothing in class 025.<br><br>For: Entertainment services in the nature of personal appearances by a costumed mascot character in class 041. |
| 4,941,154 | GO GREEN GO WHITE | For: Dresses; Headwear; Scarves; Sweatshirts; T-shirts in class 025.<br><br>For: Educating at university or colleges; Education services in the nature of courses at the university level in class 041. |
| 5,253,964 | SPARTANS WILL. | For: Headwear; Sweatshirts; T-shirts; Tank tops; Hooded sweatshirts in class 025.<br><br>For: Educating at university or colleges; |

36

| | | |
|---|---|---|
| | | Education services in the nature of courses at the university level in class 041. |
| 5,340,796 |  | For: Dresses; Footwear; Headwear; Jackets; Jerseys; Leggings; Pants; Shirts; Shirts for infants, babies, toddlers and children; Shorts; Sweat pants; Sweaters; Swim suits; Athletic shirts; Hooded sweat shirts; Polo shirts; Sport shirts; Sweat shirts; T-shirts in class 025.<br><br>For: Educating at university or colleges; Education services in the nature of courses at the university level in class 041. |

The above U.S. registrations for the MSU Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. The registrations for the MSU Trademarks constitute prima facie evidence of their validity and of MSU's exclusive right to use the MSU Trademarks pursuant to 15 U.S.C. § 1057(b). True and correct copies of the Federal Trademark Registrations for the above MSU Trademarks are attached hereto as **Exhibit 6**.

57.     MSU's intercollegiate football, baseball, basketball and other athletic teams (collectively, the "MSU Teams") and the MSU Trademarks are widely known to, and enormously popular with, both sports fans and the general public. MSU has promoted and advertised MSU, the MSU Teams and the MSU Trademarks extensively for many years. The MSU Trademarks are among the most renowned and immediately recognizable marks in college sports today. As a result of substantial advertising, promotion and media attention, and MSU's extensive licensing and sponsorship program for a wide variety of goods and services, the MSU Trademarks have acquired secondary meaning and represent significant goodwill of great value to MSU and the MSU Teams.

58.     Millions of fans have attended MSU sports games and related events, enjoyed television and radio broadcasts of MSU games and related events, and purchased merchandise bearing the MSU Trademarks to identify with their favorite MSU Team.  Thousands more visit <msuspartans.com>, the official MSU athletics website, which prominently displays the MSU Trademarks.

59.     A significant aspect of MSU's business and resulting revenues has been for many years, and continues to be, the merchandising and licensing of the MSU Trademarks.  MSU, in conjunction with its licensing agent Collegiate Licensing Company, LLC ("CLC"), has entered into numerous licensing agreements in the United States and around the world, authorizing use of the MSU Trademarks on a wide variety of products, including apparel, caps, jewelry, toys, and pennants, among others (collectively, "MSU Products").  Wholesale sales in 2020 of MSU Products was over $23,000,000 dollars in the United States and over $114,000,000 dollars in foreign markets.

60.     MSU, directly and through authorized licensees, has established and maintained high standards of quality for MSU Products, and continues to maintain stringent quality control over licensees and other authorized users of the MSU Trademarks.

61.     In supervising licensees, MSU provides licensees and licensed product manufacturers with specifications setting forth extensive details with respect to use of the MSU Trademarks, including typeface and typography, color renderings, official uniform scripts, graphic designs, materials, workmanship, and quality.  All MSU Products and designs appearing thereon are reviewed under these strict quality control procedures.

62.     As a result of the extensive use of the MSU Trademarks, not only in connection with MSU's well-known sports games, exhibitions and services, but also in connection with a

wide variety of licensed merchandise promoted, sold and/or rendered in the United States and abroad, as well as widespread use in connection with a broad array of sponsorship activities spanning diverse industries, such trademarks have for many decades, and long prior to any use made by Defendants, functioned as unique identifiers and synonyms in the public mind for MSU and the affiliated and related MSU Teams. As a result, the MSU Trademarks are famous and possess significant goodwill of great value to MSU and its affiliated and related MSU Teams.

63.     The MLB Trademarks, the NBA Trademarks, the NHL Trademarks, the NFL Trademarks, the CLC Trademarks, and the MSU Trademarks are hereinafter collectively referred to as "Plaintiffs' Trademarks."

**The Defendants**

64.     Defendants are individuals and business entities of unknown makeup who own and/or operate one or more of the e-commerce stores under at least the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to Plaintiffs. On information and belief, Defendants reside and/or operate in the People's Republic of China or other foreign jurisdictions, or redistribute products from the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).

65.     On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto. Tactics used by Defendants to conceal their identities and the full scope of their operations make it virtually impossible for Plaintiffs to learn Defendants' true identities and the exact interworking of their counterfeit network. If Defendants provide additional credible information regarding their identities, Plaintiffs will take appropriate steps to amend the Complaint.

## IV. DEFENDANTS' UNLAWFUL CONDUCT

66.     The fame of Plaintiffs' Trademarks and the success of Plaintiffs' respective athletic brands and affiliated variety of products, including apparel, caps, jewelry, toys, furniture, pennants, and bags, among others (collectively, "Plaintiffs' Genuine Products"), has resulted in significant counterfeiting of the trademarks owned by these entities.  TML administers CAPS on behalf of its members, MLBP, NHLE, NBAP, CLC and NFLP.  CAPS has created an extensive anti-counterfeiting program, which includes regularly investigating suspicious e-commerce stores identified in proactive Internet sweeps and reported by a variety of informants in response to the significant counterfeiting of Plaintiffs' Trademarks.  In recent years, CAPS, on behalf of its above-identified members, has identified numerous fully interactive e-commerce stores including those operating under the Seller Aliases, which are offering for sale and/or selling Counterfeit Products to consumers in this Judicial District and throughout the United States.  E-commerce sales, including through e-commerce stores like those of Defendants, have resulted in a sharp increase in the shipment of unauthorized products into the United States.  **Exhibit 7**, Excerpts from Fiscal Year 2018 U.S. Customs and Border Protection ("CBP") Intellectual Property Seizure Statistics Report.  Over 90% of all CBP intellectual property seizures were smaller international mail and express shipments (as opposed to large shipping containers).  *Id*. Over 85% of CBP seizures originated from mainland China and Hong Kong.  *Id*.  Counterfeit and pirated products account for billions in economic losses, resulting in tens of thousands of lost jobs for legitimate businesses and broader economic losses, including lost tax revenue.

67.     Counterfeiters "routinely use false or inaccurate names and addresses when registering with these Internet platforms," that do not require sellers to verify their identities. **Exhibit 8**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*,

40 Nw. J. Int'l L. & Bus. 157, 186 (2020); *see also* report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020), attached as **Exhibit 9** and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and recommending that "[s]ignificantly enhanced vetting of third-party sellers" is necessary. Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by preemptively establishing multiple virtual store-fronts. **Exhibit 9** at p. 22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated. **Exhibit 9** at p. 39. Further, "E-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." **Exhibit 8** at 186-187.

68. Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, have sold Counterfeit Products to residents of Illinois.

69. Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies. For example, Defendants facilitate sales of Counterfeit Products by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers, including, in many instances, by copying the layouts, terms of service, legal notices and/or contact information found on the websites of Plaintiffs' authorized online retailers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars

via credit cards, Alipay, Amazon Pay, and/or PayPal. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer. On information and belief, Plaintiffs have not licensed or authorized Defendants to use any of the Plaintiffs' Trademarks, and none of the Defendants are authorized retailers of Plaintiffs' Genuine Products.

70. Many Defendants also deceive unknowing consumers by using one or more of Plaintiffs' Trademarks without authorization within the content, text, and/or meta-tags of their e-commerce stores to attract various search engines crawling the Internet looking for websites relevant to consumer searches for Plaintiffs' Genuine Products. Other e-commerce stores operating under Seller Aliases omit using Plaintiffs' Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Plaintiffs' Genuine Products. Upon information and belief, those Defendants that do not use Plaintiffs' Trademarks in searchable text do so in an effort to avoid detection of their Counterfeit Products.

71. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete information to e-commerce platforms to prevent one from learning their true identities and the scope of their e-commerce operation.

72. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Counterfeit Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities, the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

73. Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers, such as templates with common design elements that intentionally omit any contact information or other information for identifying Defendants or other Seller Aliases they operate or use. E-commerce stores operating under the Seller Aliases include other notable common features such as use of the same registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Counterfeit Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Products were manufactured by and come from a common source and that Defendants are interrelated.

74. E-commerce store operators like Defendants are in constant communication with each other and regularly participate in QQ.com chat rooms and through websites such as sellerdefense.cn, kaidianyo.com and kuajingvs.com regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits.

75. Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation in spite of Plaintiffs' enforcement. E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to off-shore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to Plaintiffs. Indeed, analysis of financial account transaction logs from previous similar cases indicates that off-shore counterfeiters regularly move funds from U.S.-based financial accounts to off-shore accounts outside the jurisdiction of this Court.

76.     Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Counterfeit Products in the same transaction, occurrence, or series of transactions or occurrences.  Defendants, without any authorization or license from any of the Plaintiffs, have jointly and severally, knowingly and willfully used and continue to use one or more of Plaintiffs' Trademarks in connection with the advertisement, distribution, offering for sale, and/or sale of the Counterfeit Products into the United States and Illinois over the Internet.

77.     Defendants' unauthorized use of one or more of Plaintiffs' Trademarks in connection with the advertising, distribution, offering for sale, and sale of Counterfeit Products, including into the United States, including Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiffs.

### COUNT I
### TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

78.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.

79.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit or infringing imitations of one or more of Plaintiffs' Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods.  Plaintiffs' Trademarks are highly distinctive marks.  Consumers have come to expect the highest quality from Plaintiffs' respective products sold or marketed under Plaintiffs' Trademarks.

80.     Defendants have sold, offered to sell, marketed, distributed and advertised, and are still selling, offering to sell, marketing, distributing and advertising products using

counterfeit or infringing reproductions of one or more of Plaintiffs' Trademarks without Plaintiffs' permission or consent.

81.     Plaintiffs are the owners and/or the exclusive licensees of their respective Plaintiffs' Trademarks. The U.S. Registrations for Plaintiffs' Trademarks (Exhibits 1-6) are in full force and effect. Upon information and belief, Defendants have knowledge of Plaintiffs' rights in Plaintiffs' Trademarks, and are willfully infringing and intentionally using counterfeits or infringements of one or more of Plaintiffs' Trademarks. Defendants' willful, intentional and unauthorized use of one or more of Plaintiffs' Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the counterfeit or infringing goods among the general public.

82.     Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

83.     Plaintiffs have no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their reputation and the goodwill of their well-known Plaintiffs' Trademarks.

84.     The injuries and damages sustained by Plaintiffs have been directly and/or proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and/or sale of the Counterfeit Products.

**COUNT II**
**FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))**

85.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.

86.     Defendants' promotion, marketing, offering for sale, and/or sale of the Counterfeit Products has created and is creating a likelihood of confusion, mistake, and

deception among the general public as to the affiliation, connection, or association with Plaintiffs, or as to the origin, sponsorship, or approval of Defendants' Counterfeit Products by Plaintiffs.

87.     By using one or more of Plaintiffs' Trademarks on the Counterfeit Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Counterfeit Products.

88.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Counterfeit Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

89.     Plaintiffs have no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their respective reputations and the goodwill of Plaintiffs and their respective Plaintiffs' Trademarks.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily, preliminarily and permanently enjoined and restrained from:

   a. using any of Plaintiffs' Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, promotion, marketing, advertising, offering for sale, or sale of any product that is not one of Plaintiffs' Genuine Products or is not authorized by Plaintiffs to be sold in connection with Plaintiffs' Trademarks;

    b. passing off, inducing, or enabling others to sell or pass off any products as Plaintiffs' Genuine Products or any other products produced by Plaintiffs that are not Plaintiffs', or not produced under the authorization, control, or supervision of Plaintiffs and approved by Plaintiffs for sale under Plaintiffs' Trademarks;

    c. committing any acts calculated to cause consumers to believe that Defendants' Counterfeit Products are those sold under the authorization, control, or supervision of Plaintiffs, or are sponsored by, approved by, or otherwise connected with Plaintiffs;

    d. further infringing Plaintiffs' Trademarks and damaging Plaintiffs' goodwill; and

    e. manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiffs, nor authorized by Plaintiffs to be sold or offered for sale, and which bear any of Plaintiffs' trademarks, including the Plaintiffs' Trademarks, or any reproductions, counterfeit copies, or colorable imitations thereof;

2) Entry of an Order that, at Plaintiffs' choosing, the registrant of the Domain Names shall be changed from the current registrant to Plaintiffs, and that the domain name registries for the Domain Names, including, but not limited to, VeriSign, Inc., Neustar, Inc., Afilias Limited, CentralNic, Nominet, and the Public Interest Registry, shall unlock and change the registrar of record for the Domain Names to a registrar of Plaintiffs' selection, and that the domain name registrars, including, but not limited to, GoDaddy Operating Company, LLC ("GoDaddy"), Name.com, PDR LTD. d/b/a PublicDomainRegistry.com ("PDR"), and Namecheap Inc. ("Namecheap"), shall take any steps necessary to transfer the Domain

Names to a registrar account of Plaintiffs' selection; or that the same domain name registries shall disable the Domain Names and make them inactive and untransferable;

3) Entry of an Order that, upon Plaintiffs' request, those with notice of the injunction, including, without limitation, any online marketplace platforms such as eBay, AliExpress, Alibaba, Amazon, Wish.com, and Dhgate (collectively, the "Third Party Providers") shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using Plaintiffs' Trademarks

4) That Defendants account for and pay to Plaintiffs all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged and that the amount of damages for infringement of Plaintiffs' Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

5) In the alternative, that Plaintiffs be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of Plaintiffs' Trademarks;

6) That Plaintiffs be awarded their reasonable attorneys' fees and costs; and

7) Award any and all other relief that this Court deems just and proper.

Dated this 18th day of October 2021.  Respectfully submitted,

/s/ Justin R. Gaudio
Amy C. Ziegler
Justin R. Gaudio
Allyson M. Martin
Jake M. Christensen
Greer, Burns & Crain, Ltd.
300 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
312.360.0080
312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law
amartin@gbc.law
jchristensen@gbc.law

*Attorneys for Plaintiffs*
*NBA Properties, Inc., MLB Advanced Media, L.P.,*
*Major League Baseball Properties, Inc., NHL*
*Enterprises, L.P., NFL Properties LLC, Collegiate*
*Licensing Company, LLC and Board of Trustees of*
*Michigan State University*